PHYLLIS M. CURTIS BERENBEIM, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JEROME P. BERENBEIM, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Berenbeim v. Commissioner
Docket Nos. 37873-87, 1281-88
United States Tax Court
T.C. Memo 1992-272; 1992 Tax Ct. Memo LEXIS 294; 63 T.C.M. (CCH) 2975; May 12, 1992, Filed *294 Decisions will be entered under Rule 155. P-W had been divorced and then married P-H. P-H obtained money by means of a Ponzi scheme and failed to report the income or file returns. P-W, who had some income of her own and was unfamiliar with P-H's business matters, provided P-H with her tax information and signed joint returns of income which she believed were filed. P-H did not file these returns. At one point when confronted by R's officer as to why she did not file, P-W obtained photocopies of the joint returns from P-H and provided them to R's officer explaining that she had been divorced and was not filing under P-H's family name. R's officer accepted the copies of returns and P-W's explanations, and closed his inquiry. About 2 years later, P-H's Ponzi scheme collapsed and thereafter R's agents began an inquiry into P-H and P-W's tax matters, whereafter it was discovered that no returns had been filed. R's agents inquired about whether P-W filed returns and they were provided with photocopies of returns which P-W believed had been filed. R's agents caused the photocopies to be filed even though the copies did not contain original signatures and it is generally not R's policy *295 to file such return documents. The photocopies were filed without P-W's knowledge or consent. P-W contends that she is an innocent spouse under either sec. 6013(e) or sec. 66(c), I.R.C. R contends that she is not and that sec. 66(c), I.R.C., is not applicable because of the photocopies of returns that R's agents caused to be filed. P-W also contends that P-H never had title to the embezzled funds and that under California law, such funds were not community property. Held, the photocopies of returns were not "joint returns" for purposes of sec. 6013(e), I.R.C.Held, further, P-H did not obtain title to the property obtained through the Ponzi scheme and California law interpreted not to include such property as community property. Paul Frederic Marx and Joseph D. Carruth, for petitioner Phyllis M. Curtis Berenbeim. Jerome P. Berenbeim, pro se. Frank R. Bailey III, Bernard Lambert, and Donald P. Gilliland, for respondent. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent determined deficiencies in income tax and additions to tax for several years and issued three separate notices of deficiency, [1] all dated October 23, 1987, to petitioners *296 [2] reflecting the following amounts: Jerome P. Berenbeim
Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a)
1979
$ 66,215
$ 33,107.50
$ 2,621
Phyllis M. Curtis Berenbeim
Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6654(a)
1979
$ 64,360
$ 32,180
$ 2,544
Jerome P. & Phyllis M. Berenbeim
Additions to Tax
Year
Deficiency
Sec. 6653(b)
Sec. 6653(b)(1)&(2)
Sec. 6661
1980
$ 163,109
$ 81,555
none  none
1981
5,817
6,117
none  none
1982
297,705
none [1] $ 152,186
*297 Respondent, by means of amendments to her answers in both consolidated cases, seeks an increased income tax deficiency for the 1981 taxable year from $ 5,817 to $ 45,981. Concerning petitioner Jerome P. Berenbeim the addition to tax under sec. 6653(b) [3] would also be increased from $ 6,117 to $ 26,199. Concerning petitioner Phyllis M. Curtis Berenbeim the addition to tax under sec. 6653(a) would be $ 2,620 and under sec. 6651(a)(1) would be $ 11,409 if respondent is sustained regarding the increased deficiencies and if petitioner wife is found liable for such additions. These cases present a panoply of innocent spouse issues as follows: (1) Whether petitioner husband earned and failed to report illegal income for any of the 4 taxable years; (2) whether petitioner husband is liable for an addition to tax under section *298 6653(b) or 6653(b)(1) and (2) for fraud in any of the 4 taxable years; and in the alternative, whether petitioner husband is liable for additions to tax under sections 6651(a)(1), 6653(a), or 6653(a)(1) and (2) for any of the taxable years; (3) whether photocopies of signed joint Federal income tax returns delivered to respondent's agents upon their request and later filed by those agents constitute valid tax returns; (4) if the photocopied returns constitute "returns", whether petitioner wife is an innocent spouse under the provisions of section 6013(e); (5) if the unsigned returns are not "returns", whether petitioner wife is an innocent spouse under the provisions of section 66(c); (6) whether the illegal income or any other income of petitioner husband constitutes community property under California law and can be attributed to petitioner wife; and (7) whether petitioner wife is liable [4] for additions to tax under sections 6653(a), 6653(a)(1) and (2), 6651(a)(1), 6654, or 6661, as determined or asserted by respondent. *299 FINDINGS OF FACT The parties have entered into agreed stipulations of fact, along with attached exhibits, all of which are incorporated by this reference. Petitioners were, at all pertinent times, married and had their legal residence at Mission Viejo, California, at the time of the filing of the petitions herein. Background
Mr. Berenbeim received a bachelor of arts degree in psychology from the University of California at Los Angeles in 1954 and since then has, at various times, been a licensed insurance salesman and a financial adviser, and from 1972 to 1974 he was employed as a salesman of tax shelters. During the years under consideration, Mr. Berenbeim held himself out as a financial consultant involving insurance, real estate, pension and profit sharing-type plans, tax shelters, and tax return preparation. Mrs. Berenbeim received a bachelor of music education degree from East Texas State, a master of education degree from Adam State College, Colorado, and a supervisory credential from the University of Southern California. From 1959 through the taxable years under consideration, she has held various teaching positions, most of which involved music. She has served *300 as the music coordinator for a county public education program. From 1977 to the time of trial, she was a county department of education coordinator of arts for the handicapped and coordinator of special awards, which included organizing an annual festival, teacher workshops, and other related matters. She had no formal training in bookkeeping, accounting, taxation or business administration. During the years 1978 through 1984, petitioner wife's annual salary was $ 23,763.24, $ 32,356.83, $ 32,810.56, $ 35,306.26, $ 37,723.75, $ 40,260.53, and $ 43,039.96, respectively. Federal income tax was withheld from petitioner wife's salary in the amounts of $ 5,613, $ 6,200, $ 6,763, $ 6,989, and $ 7,098 for the years 1979, 1980, 1981, 1982, and 1983, respectively. Additionally, she earned interest on her bank accounts of $ 4,858, $ 6,321, $ 5,058, $ 9,724, and $ 9,841 for 1979, 1980, 1981, 1982, and 1983, respectively. Petitioner wife's father died during 1973 and she received the following distributions from his estate: 1973 through 1978 -- $ 73,045.72; 1979 through 1982 -- $ 43,258.05; and 1983 -- $ 5,696.06. Petitioner wife had savings and checking accounts. The inheritance received *301 was deposited at various times in savings or checking accounts and used for all types of expenditures, including living expenses. Petitioner wife also inherited (and retained) from her father a 60-acre parcel of Texas ranchland worth about $ 2,000 per acre. Mrs. Berenbeim was married to her first husband from 1957 until she obtained a divorce in 1971. Thereafter, until 1974 when she married Mr. Berenbeim, she was single and resided with her son Kurt. At the time of his marriage to petitioner wife, petitioner husband did not own a house. Petitioner husband gave three significant gifts to petitioner wife during the years under consideration: An electric piano during 1977; a $ 6,000 grand piano during 1979; and a $ 700 ring during 1982. Mrs. Berenbeim did not own any other expensive jewelry or a fur coat and no other significant items were purchased for or by her during the marriage. Mr. Berenbeim also leased a Datsun 280ZX automobile for Mrs. Berenbeim during the years 1979 through 1982 at an annual cost of approximately $ 3,300. At the time of the lease Mrs. Berenbeim already owned two automobiles, a late model Toyota Celica and an older Jaguar. During the years 1979, 1980, *302 1981, and 1982, petitioners' vacation expenses were in the amounts of $ 2,400, $ 5,280, $ 2,280, and $ 2,461, respectively, which were paid by Mr. Berenbeim. Mr. Berenbeim also paid $ 4,800 of a $ 5,000 fee for plastic surgery for Mrs. Berenbeim during 1982. Mrs. Berenbeim paid household expenses out of her checking account and Mr. Berenbeim would contribute any amounts in excess of Mrs. Berenbeim's salary needed to run the household. Prior to her marriage to petitioner husband, Mrs. Berenbeim caused the execution of a prenuptial agreement in order to protect her separate property, including her inheritance from her father. The prenuptial agreement contained the following language concerning petitioner husband: "All income from labor and/or salary by the [petitioner] husband shall be the community property of the husband and wife." During their marriage, petitioners separated on two occasions, each time for a period somewhat less than a month. Prior to her marriage to Mr. Berenbeim, petitioner wife's income tax returns were prepared by an accounting firm. The Ponzi Scheme
Petitioner husband, during the years in issue, was involved in a "Ponzi-type" scheme. [5] He convinced *303 people that he was a successful financial adviser and that he could obtain a large percentage of return on money invested. The investors were led to believe that there was no risk. Many of the investors were friends, acquaintances, and coworkers of petitioners. Although the story may have varied somewhat concerning each individual, Mr. Berenbeim led the investors to believe he had access to a group of successful and/or wealthy business people who turned over capital relatively quickly and were willing to pay high interest on borrowing. Mr. Berenbeim sometimes referred to the investment opportunity as the "The Fund". On some occasions he would tell investors that he was investing their money in factoring transactions. Petitioner husband promised interest or a return in excess of 20 percent. Some of the investors were promised returns as high as 30 percent. *304 The investor would remit money to Mr. Berenbeim, who would in turn execute a note in the amount of the remittance along with interest to be paid monthly for a period of time (i.e., 2 years), at which time the principal of the note would be repaid to the investor. Mr. Berenbeim would request investors to turn over their investment in cashier's checks in amounts less than $ 10,000 to avoid the reporting of currency transactions to the Internal Revenue Service. In one such instance Mr. Berenbeim was paid $ 30,000 and he executed a $ 30,000 note providing for $ 750 monthly payments for a period of 2 years. Mr. Berenbeim was to receive a commission [6] from each investor. Mr. Berenbeim also represented to investors that their investment could be withdrawn at any time without penalty upon 24 hours' notice. Mr. Berenbeim is a persuasive and convincing person who won the confidence of the investors and of his wife. *305 Mr. Berenbeim misled the investors. There were no wealthy or successful businessmen and "The Fund" did not exist. Mr. Berenbeim was paying interest on the notes from the money received from investors and converting some part of the funds received to his own personal use. At a point in time approaching the latter part of 1982, various investors were having difficulty reaching Mr. Berenbeim and, in some instances, he had not visited them or made their monthly payment and/or he had failed to return their principal at the end of the 2-year term. Petitioner husband's Ponzi scheme pyramid collapsed around that time and numerous civil suits were instituted by some of the investors seeking the return of their money and damages. During the period 1983 through 1985 most of the civil suits resulted in judgments against Mr. Berenbeim only, generally either by stipulation or default. The judgments were generally founded on allegations that Mr. Berenbeim had defrauded the plaintiffs. In the amended felony complaint filed against petitioner husband, it was alleged that the investors did not intend to pass title to their funds to Mr. Berenbeim. It was also alleged that the funds were given *306 over to Mr. Berenbeim for investment purposes to receive income for a period of time and then the principal was to be returned to the investors. During 1986 petitioner husband was charged with 24 felony counts and during 1987 he pled guilty to 3 felony counts involving the willful and unlawful taking of money from others during 1982 and 1983 and he was sentenced to imprisonment for more than 1 year. The civil complaints filed against petitioner husband contained allegations that the plaintiff-investors did not intend to pass title and that the funds were given over for investment purposes. Further, it was alleged that the funds could be withdrawn at any time on 24 hours' notice. Petitioner husband's Ponzi scheme ended in a tangled mess and complex myriad of receipts and payments in connection with various investors. For example, Wayne and Palmira Bird delivered $ 150,000 to Mr. Berenbeim in 1982, and he made payment to them of $ 22,500 in 1982 and $ 10,000 in 1983. In another instance, Lou Prokop delivered $ 60,000 in 1979 and $ 45,000 in 1980 and received the following payments: $ 10,200 in 1979, $ 22,056 in 1980, and $ 23,256 in 1981. Petitioner husband intentionally kept *307 petitioner wife from knowing about the fraudulent nature of his scheme to convert the funds of others to his personal use. Petitioner wife was also bilked of some of her funds by petitioner husband. Over the years 1978 through 1983 she loaned $ 76,590 to petitioner husband and received $ 10,000 in repayment. Instead of paying back some of the loans, petitioner husband convinced petitioner wife to invest $ 15,000 in "The Fund" during June 1982. At a point where the pyramiding scheme was approaching collapse, petitioner wife became suspicious because of calls and inquiries by various friends and acquaintances concerning petitioner husband's failure to make monthly payments. At that time, petitioner wife asked petitioner husband about his activities. Up to that point, petitioner wife believed that petitioner husband was a successful financial consultant. Petitioner wife was generally recognized in the community, by petitioner husband, and by her former husband as being relatively naive, honest, and trusting. Petitioner wife trusted petitioner husband and permitted him to manage their financial and tax matters. She was prone to accept his explanations without question. Following *308 a lead from local law enforcement authorities, respondent's agents began an examination of petitioner's 1979 through 1982 taxable years. After obtaining copies of the 1980 through 1982 returns, respondent's agents, beginning early in 1986, attempted to discuss the Ponzi scheme and related income tax matters with petitioner husband, but he was uncooperative. Mr. Berenbeim kept certain records, but he refused and/or failed to turn over adequate records of these transactions and respondent was forced to compute the transactions by reference to specific items of information developed from third parties. Accordingly, the various investors were contacted and, along with information gathered from local law enforcement authorities, respondent's agents computed the amount of funds received and disbursed by petitioner husband. The difference was considered to be income and was used in the notices of deficiency to arrive at the income tax deficiencies in controversy. With respect to 1980, 1981, and 1982, respondent's agents accepted the expenses and other deductions reflected on the copies of returns provided by petitioners. After issuance of the notices of deficiency, respondent found *309 a number of errors in the computation of the cash received and disbursed by petitioner husband. Generally, the more substantial errors involved an amount being put in the wrong year, which did not generally affect the overall deficiencies, but moved the tax incidence from one year to another. Finally, in connection with the stipulation of facts and evidence which came to light during the trial, respondent further adjusted the figures to arrive at the following correct and uncontroverted totals of receipts and dispersals from the Ponzi scheme: 1979
1980
1981
Received
$ 292,900
$ 480,451
$ 476,238
Paid out
57,432
129,003
336,696
Net
$ 235,468
$ 351,448
$ 139,542
1982
1983
Total
Received
$ 1,037,843
$ 98,500
$ 2,385,932
Paid out
643,750
98,493
1,265,374
Net
$ 394,093  $ 7     $ 1,120,558
Tax Returns and Return Preparation
Petitioners' 1974 through 1977 joint Federal income tax returns were prepared by the same accountants that had previously prepared petitioner wife's individual returns. Beginning in 1978, petitioner husband began preparing petitioners' joint Federal income tax returns. Petitioner husband would instruct petitioner *310 wife to provide all her income and deduction items to him and he would incorporate them into a return which petitioner wife signed on each occasion it was presented by petitioner husband. On those occasions, petitioner wife might generally look at the return, but did not understand it and rarely would she look at the Schedule C reflecting petitioner husband's business activity. Although petitioner wife thought that petitioner husband earned commissions as a financial consultant, she was unaware that he had not reported those commissions on the joint returns that she was asked to sign. For the 1979, 1980, 1981, and 1982 taxable years petitioner wife provided petitioner husband with her tax information and petitioner husband would prepare a joint Federal income tax return. Petitioner wife, when requested, would sign the returns, during the appropriate time of year. Petitioner husband was also responsible for filing the returns. Without the knowledge of petitioner wife, petitioner husband did not file the 1979, 1980, 1981, or 1982 joint Federal income tax returns. During September 1984, Revenue Officer William Nicholson contacted petitioner wife regarding her failure to file Federal *311 income tax returns for 1980 through 1983 under the name Phyllis Curtis (her former married name). Petitioner wife explained that she was now filing under a new name on a joint return with her new husband. On September 24, 1984, petitioner wife obtained from petitioner husband and hand delivered to Revenue Officer Nicholson what she thought to be retained copies of filed joint Federal income tax returns for the taxable years 1980 through 1982. Shortly thereafter, petitioner husband delivered what purported to be a copy of petitioners' 1983 joint Federal income tax return. The copies of the returns bore petitioners' photocopied signatures. For the 1980 through 1982 returns, in addition to petitioner wife's wages and interest income, the copies of returns reflected (on Schedule C) about $ 32,000 to $ 35,000 of gross receipts for petitioner husband. Based upon the copies of returns he received from petitioners and in accord with internal procedures, Revenue Officer Nicholson was satisfied and concluded his investigation without any further action during October 1984. Revenue Officer Nicholson's case file, along with the copies of returns provided by petitioners, was destroyed about *312 6 months later. Respondent began an investigation of petitioners early in 1986 in connection with their failure to file and petitioner husband's Ponzi scheme. Petitioner wife attended three meetings with respondent's agents during 1986. During April 1986 petitioner wife and her attorney met with Special Agent Anthony Falcone and Revenue Agent Al Ginsburg. Petitioner wife advised that copies of returns had been given to Revenue Officer Nicholson during 1984 and on July 17, 1986, additional copies of the 1980 through 1983 returns were provided to Special Agent Falcone and Revenue Agent Ginsburg by petitioner wife's attorney. These copies likewise bore petitioners' photocopied signatures. On the two occasions where petitioner wife supplied copies of the returns, she was merely complying with respondent's agent's requests and she did not request that the documents be filed with the Internal Revenue Service. Thereafter, Special Agent Falcone, upon advice of Internal Revenue Service District Counsel's Office, forwarded the provided copies to the Fresno Service Center with instructions to accept them as filed as of October 23, 1984 (the date first received by Revenue Officer Nicholson). *313 The service center received the copies from Special Agent Falcone on August 30, 1986, and processed them in accord with Special Agent Falcone's instructions as though they had been filed October 23, 1984. It is generally the practice of the Internal Revenue Service Centers, however, not to file a return unless it has an original signature. In situations where an original signature is missing, the service center employee will either send the document back to the taxpayer for signature or a signature will be separately requested. Respondent, in determining deficiencies for petitioners' 1980 through 1982 taxable years, used joint rates to compute the amount of tax based upon the copies of joint Federal income tax returns filed at the request of Special Agent Falcone. Respondent also allowed deductions as had been claimed in the 1980 through 1982 copies of the joint Federal income tax returns. Residences and Realty
During the early part of their marriage and up through 1978, petitioners enjoyed a comfortable lifestyle, residing in a 2,400-square-foot apartment, traveling, and adequately covering household expenses. During that time petitioner husband contributed about $ *314 1,000 per month to the household expenses. During October 1976, petitioner wife purchased, in her own name, a residence located at Alpen Drive, Lake Arrowhead, California. The purchase price was $ 55,000 and petitioner wife made a $ 5,500 downpayment from her separate funds. During January 1979, petitioner wife purchased, in her own name, a three-bedroom, 2,700-square-foot residence at Willow Wood Street, El Toro, California, for $ 123,950. The $ 15,600 downpayment was paid from her separate funds. Petitioner wife made the mortgage and related payments on these two properties, amounting to about $ 18,000 in 1979, $ 16,000 in 1980, $ 8,000 in 1981, $ 7,500 in 1982, and $ 8,000 in 1983. The payments were less after 1980 because petitioner wife sold the Willow Wood residence for $ 178,000 during December of 1980. During November 1979, petitioner wife purchased a residence at Nyes Place, Laguna Beach, California, for $ 365,000. The downpayment was $ 34,450. Title was in petitioner wife's name because of petitioner husband's poor credit rating. The payments on this property were made by petitioner wife from her own funds and from funds provided by petitioner husband. The property *315 was subject to three deeds of trust in the amounts of $ 144,002.25, $ 106,800, and $ 80,200, respectively. The entire balance of the $ 106,800 was due in January 1982. Petitioners were unable to pay off the balance, and the mortgage was foreclosed on the Nyes Place residence during June 1983. During November 1982, a condominium located at Stonebrook, Costa Mesa, California, was purchased in petitioner wife's name for the use of her son. The $ 12,826 downpayment was from her separate funds. This property was foreclosed upon during May or June 1983. In connection with the funds from his Ponzi scheme, petitioner husband began purchasing real property during the years under consideration. Several of these properties (located in North Bay, Los Robles, and Nadlehorn) were purchased in petitioner wife's name as a nominee for petitioner husband. Although petitioner wife attended the closings and/or signed documents on these properties, she was unaware of the details and signed them at her husband's request. Property located at Cypress, Morningstar, St. Bernard, San Mateo, Pebble Beach, and Navel Orange were all titled in petitioner husband's name alone. Some or all of these properties *316 were connected with certain of the investors in the Ponzi scheme. After the Ponzi scheme collapsed, the North Bay, Los Robles, Nadlehorn, Morningstar, Stonebrook, St. Bernard, Avocado Crest, Leisure Way, Pebble Beach, San Mateo, and Malaga Drive properties were all lost, without gain of any kind, in foreclosure actions. The Cypress and Alpen Drive properties in some manner ended up titled solely in the names of certain of the investors. Petitioner husband had unreported gains from the sale or exchange of realty of $ 43,852.75 during 1982. Bank Accounts and Expenditures
Petitioner wife maintained a checking account with the Bank of America. Petitioner husband utilized petitioner wife to pay some of his business expenses as one might use a personal secretary. She would pay his business expenses out of her Bank of America account and he would reimburse her for such payments. The source of deposits to petitioner wife's checking account was from her salary and inheritance. Also, during 1979, 1980, 1981, 1982, and 1983, petitioner husband provided the following amounts which were deposited to petitioner wife's Bank of America account: $ 9,850, $ 40,470, $ 39,910.76, $ 43,540, *317 and $ 9,430, respectively. Many times these deposits were made by petitioner husband and petitioner wife was not aware whether the deposits consisted of checks, cash, or a combination of checks and cash. During those same years, the following amounts were paid, in connection with the general categories listed, from the Bank of America account: Category
1979
1980
1981
1982
1983
Real estate, wife
$ 19,027
$ 57,884
$ 50,970
$ 51,287
$ 16,764
Wife's automobile
7,937
4,483
6,653
4,466
4,871
Charge accounts
6,103
7,145
5,353
3,441
5,451
Life insurance
306
306
306
306
306
Wife's son
1,570
3,309
4,608
2,618
1,763
Miscellaneous
1,136
4,071
3,143
1,357
7,031
Husband's automobile
2,446
3,264
4,884
3,240
2,976
Real estate, husband
-
-
6,156
11,934
3,998
Totals     $ 38,525
$ 80,462
$ 82,073
$ 78,649
$ 43,160
During 1983 petitioner wife used approximately $ 7,000 of her inherited funds to pay household expenses and $ 12,000 to pay attorneys for her representation concerning lawsuits filed against petitioner husband. Indicia of Fraud
Petitioner husband defrauded many friends and acquaintances of petitioners. In addition *318 to felony convictions for this activity, many of these people civilly sued petitioner husband in suits sounding in fraud. Those civil suits ended in judgments against petitioner husband. Prior to the years considered here, petitioner husband and a former wife were the subject of civil fraud proceedings concerning the sale of tax shelter investments. Petitioner husband attempted to keep the Internal Revenue Service from acquiring knowledge of his activities by requiring investors to pay in amounts less than $ 10,000. A large percentage of the amounts repaid to investors was made in cash and petitioner husband dealt extensively in cash during the years under consideration. Petitioner husband was involved in offshore banking activity. In one instance, petitioner husband made a payment of about $ 50,000 by means of a series of cashier's checks, none of which exceeded $ 10,000. In connection with this activity, petitioner maintained records of his Ponzi scheme, but testified at trial that no such records existed. The records that petitioner husband admitted to were insufficient to easily determine the amount of receipts and payments, requiring respondent to reconstruct the income *319 from the Ponzi scheme activity. A number of the investors identified a record book used by petitioner which petitioner husband refused to produce. Petitioner husband placed realty in petitioner wife's former married name to avoid detection of his accumulation of real property by investors and/or the Government, including the Internal Revenue Service. Petitioner husband held himself out as a preparer of Federal income tax returns and was familiar with his filing obligations. Petitioner husband had filed income tax returns for taxable years prior to 1979. Petitioner husband deceived and misled petitioner wife into believing that returns had been filed for the years under consideration. Petitioner husband's failure to file returns and report tax was fraudulent with the intent to evade tax. The returns that petitioner husband prepared and presented to petitioner wife for her signature, although not filed, were fraudulent and omitted substantial amounts of income from petitioner husband's legal and illegal business activities. Petitioner husband was not a credible witness. He attempted to rationalize the collapse of his scheme as a business-related failure in the face of substantial *320 evidence that he knowingly and intentionally defrauded friends, acquaintances, and his wife of their money. He also denied having detailed records even though a number of defrauded investors, who were credible witnesses, testified that petitioner kept detailed information in a "black book". Numerous other contradictory and/or contrived statements were made by petitioner husband at trial. In this connection, petitioner husband did not cooperate with respondent's agents and concealed the detailed records of his activity from respondent and this Court. OPINION The issues in this case are somewhat convoluted because of petitioners' conflicting interests and the need for separate cross-briefing between petitioners and respondent. [7] We consider the issues in a logical order, first considering whether there are deficiencies and then considering whether petitioner wife is an innocent spouse. *321 Unreported Income -- Fraud
Respondent has shown that petitioner husband either failed to file or filed and reported substantially less income than he earned during each of the 4 taxable years before the Court. Although petitioner husband filed no brief explaining his position as to whether the proceeds from the Ponzi scheme were income to him, we address that point because of its obvious application to the facts in this case. The language of section 61, "all income from whatever source derived", has been held to encompass within the definition of gross income all "accessions to wealth, clearly realized, and over which the taxpayers have complete dominion." Commissioner v. Glenshaw Glass Co., 348 U.S. 426, 431 (1955). Gross income includes funds derived from legal and illegal sources. Rutkin v. United States, 343 U.S. 130 (1952). In a case involving the embezzlement of funds by a union official, the Supreme Court held that amounts received "without the consensual recognition, express or implied, of an obligation to repay and without restriction as to their disposition" constitute income to the recipient "even though * * * [he] may *322 still be * * * adjudged liable to restore its equivalent. * * * This standard brings wrongful appropriations within the broad sweep of 'gross income'". James v. United States, 366 U.S. 213, 219 (1961). A gain "constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it." Rutkin v. United States, 343 U.S. 130, 137 (1952). It is the economic benefit accruing to the taxpayer that is the controlling factor in determining whether a particular gain is income. Commissioner v. Glenshaw Glass Co., supra.
In the instant case, petitioner husband exercised complete dominion over the Ponzi scheme funds within the meaning of Glenshaw Glass. He obtained physical possession of the funds from investors and intentionally diverted them knowing that doing so was illegal. This is also evidenced by petitioner husband's plea of guilty to felony charges. He had the ability to, and actually did, divert funds to his personal use. Although petitioner husband had executed notes with respect to the transactions, his actions prove that he did *323 not intend to fully repay the notes and that his intent was to continually expand the investor base in order to perpetuate his fraudulent scheme. Accordingly, we hold that any difference between the amounts petitioner husband received and returned in each year constituted income in the amounts set forth in the findings of fact because he exercised control over the funds and because he exhibited an intent to use the funds for personal purposes, thereby depriving the investors of their funds. Respondent determined that petitioner husband was liable for additions to tax under section 6653(b) for fraudulently understating his income in 1979, 1980, 1981, and 1982. Section 6653(b) as to 1979, 1980, and 1981 and section 6653(b)(1) as to 1982 provide that if any part of the underpayment is due to fraud, there will be an addition to tax equal to 50 percent of the entire underpayment. Fraud is defined as an intentional wrongdoing designed to evade tax believed to be owing. Powell v. Granquist, 252 F.2d 56 (9th Cir. 1958); Estate of Pittard v. Commissioner, 69 T.C. 391 (1977). Respondent has the burden of proving by clear and convincing evidence *324 that an underpayment exists for the years in issue and that some portion of the underpayment is due to fraud. Sec. 7454(a); Rule 142(b). To meet this burden, respondent must show that petitioners intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, 394 F.2d 366 (5th Cir. 1968), affg. T.C. Memo. 1966-81; Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983). Respondent need not prove the precise amount of the underpayment resulting from fraud, but only that some part of the underpayment of tax for each year in issue is attributable to fraud. Lee v. United States, 466 F.2d 11, 16-17 (5th Cir. 1972); Plunkett v. Commissioner, 465 F.2d 299, 303 (7th Cir. 1972), affg. T.C. Memo. 1970-274. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Estate of Pittard v. Commissioner, supra; Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), *325 affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed but, rather, must be established by some independent evidence of fraudulent intent. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). However, fraud may be proved by circumstantial evidence and reasonable inferences drawn from the facts because direct proof of the taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492 (1943); Rowlee v. Commissioner, supra; Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. per curiam 748 F.2d 331 (6th Cir. 1984). The taxpayer's entire course of conduct may establish the requisite fraudulent intent. Stone v. Commissioner, 56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner, supra at 105-106. The intent to conceal or mislead may be inferred from a pattern of conduct. See Spies v. United States, supra at 499. Courts have relied on a number of indicia of fraud in deciding section *326 6653(b) cases. Although no single factor is necessarily sufficient to establish fraud, the existence of several indicia is persuasive circumstantial evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Beaver v. Commissioner, supra at 93. In Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601, the Ninth Circuit Court of Appeals gave a nonexclusive list of circumstantial evidence which may give rise to a finding of fraudulent intent. Such "badges of fraud" would include: (1) Understatement of income, (2) maintenance of inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, and (6) failure to cooperate with tax authorities. The Ninth Circuit in Bradford further stated that the existence of the following facts supported our finding of fraudulent intent: (1) The taxpayer's engaging in an illegal activity; (2) his attempt to conceal such activity; (3) his dealing in cash; and (4) his failing to make estimated *327 tax payments. All of the Bradford factors are present in this case. Additionally, there is a pattern of underreporting income over an extended period of time which is also indicative of fraud. Foster v. Commissioner, 391 F.2d 727, 733 (4th Cir. 1968), affg. on this issue T.C. Memo. 1965-246; Brooks v. Commissioner, 82 T.C. 413, 431 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). Accordingly, we hold that petitioner husband is liable for an addition to tax under section 6653(b) for the taxable years 1979, 1980, 1981, and 1982. Attribution of Ponzi Scheme Income to Petitioner Wife
Petitioner wife makes a three-pronged progressive argument in support of her position that she is not liable for tax on any part of the Ponzi scheme income. First, she argues that there were no valid returns and/or no returns were filed for any of the 4 taxable years under consideration. Respondent agrees that no return was filed for the 1979 taxable year, but argues that the copies of 1980, 1981, and 1982 returns received by the special agent were filed. Second, petitioner wife argues that without *328 joint income tax returns, the unreported income from the Ponzi scheme is not attributable to her under California community property law and is accordingly not taxable. Respondent counters that petitioner wife has not shown that any part of the unreported income was not community property income. Finally, petitioner wife argues that even if it is decided that the unreported income is community property income, she is entitled to relief as an innocent spouse under section 66. Respondent counters that petitioner wife has not satisfied her burden of proving all of the necessary elements of section 66, i.e., that she did know or had reason to know of the understatement and that it is equitable to include one-half of petitioner husband's income in petitioner wife's gross income. The Returns -- Valid or Invalid and Filed or Unfiled
This is an unusual situation wherein petitioner husband deceived petitioner wife. The scenario is one where husband timely asks wife for her tax information. After receiving the information, husband prepares the return and has wife, who has separate income, sign the return. Instead of filing the returns, husband retains them while wife believes *329 that the returns had been properly filed with the Internal Revenue Service. When wife is subsequently confronted by a representative of the Commissioner's office concerning her failure to file, she obtains photocopies of the returns from husband and presents them advising that she had changed her name because of remarriage. Based upon this information the Commissioner's representative, in accord with internal instructions, closes the case and the file is destroyed about 6 months later, including the copies of returns that had been provided by wife. About 2 years later, due to husband's criminal activity, another representative of the Commissioner's office inquires about whether wife filed for the same years and wife tells story of earlier inquiry and again provides copies of the returns which she had originally believed to have been filed. The Commissioner's representative, without being asked to do so and without advising petitioners that he was doing so, caused the copies of returns to be filed. The copies of returns were in all respects normal on their face and bore photocopies of the taxpayers' signatures. On these facts, petitioner wife first argues that the copies of returns *330 without original signatures are not valid returns because they are not "signed and verified by or on behalf of the taxpayer". In support of her position, petitioner wife refers us to a line of cases which hold that an unsigned return or one that is not signed under the penalties of perjury is not a valid return for Federal income tax purposes. Cupp v. Commissioner, 65 T.C. 68, 78-79 (1975), affd. without published opinion 559 F.2d 1207 (3d Cir. 1977); Vaira v. Commissioner, 52 T.C. 986, 1005 (1969), revd. on other grounds 444 F.2d 770 (3d Cir. 1971). [8] In each of the cases cited by petitioner wife, the form or document in question was unsigned.
However, we look to the line of cases which permits us to resolve the question here without *331 deciding whether a photocopy of a return is a "return". Respondent argues that the following principles govern whether a joint return has been filed: A joint return is filed when two events occur: (1) the return is received by the location designated by the code and regulations, O'Bryan Bros. v. Commissioner, 127 F.2d 645 (6th Cir. 1942), cert. denied, 317 U.S. 647 (1942); see also Espinoza v. Commissioner, 78 T.C. 412, 418 (1982), and (2) the taxpayer intends to file the joint return, as reflected by his objective manifestations. Shea v. Commissioner, 780 F.2d 561 (6th Cir. 1986); Martin v. United States, 411 F.2d 1164, 1168 (8th Cir. 1969). We agree with these principles, but find it unnecessary to delve into an inquiry of whether receipt of a return by a revenue officer, revenue agent, or special agent of respondent could meet the "location designated by the code and regulations" language argued by respondent. [9] Instead, we focus our attention on the question of intent. *332 Respondent asks us to consider Shea v. Commissioner, 780 F.2d 561 (6th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-310, and Sharwell v. Commissioner, 419 F.2d 1057, 1059 (6th Cir. 1969), vacating and remanding T.C. Memo. 1986-89, in resolving the question of intent. In Shea, the court considered whether the taxpayer wife had intended to file a joint return with her husband. Because taxpayer wife had not signed or authorized her signature on the return in question, it was held that there was no joint return. By contrast, in Sharwell, the spouse, who had likewise not signed the return, was aware of and took an active role in the preparation of the return in question. In that case, it was held that taxpayer wife intended to file a joint return. The question here is whether petitioner wife intended to individually file a return at the time the returns were delivered to Revenue Officer Nicholson. At the time copies of returns were provided to respondent's revenue officer (pursuant to his request), petitioner wife had the false impression that joint returns had already been filed. Likewise, *333 at the time a second set of copies of returns was provided to respondent's special agent (pursuant to his request), petitioner wife still thought that joint returns had been filed, even though she had become aware of petitioner husband's Ponzi scheme. In the setting of this case, petitioner wife was not aware that returns had not been filed and had no intent to file joint or individual Federal tax returns when she provided copies of the returns to respondent's agents at their request. Obviously, petitioner wife intended to file a return when she signed and entrusted the 1980, 1981, and 1982 returns to petitioner husband for filing. Likewise, it is clear that petitioner wife did not expressly or impliedly intend to file a joint or individual return at the times she or her attorney supplied respondent's agents with copies of joint returns. Her intent was lacking because of her belief that a joint return had already been filed -- a belief which was erroneous because of petitioner husband's misrepresentation and deception. We will not transmute petitioner wife's intent and/or consent to file a return from the time when she willingly did so to a time when she supplied copies of returns *334 once intended for filing to respondent's agents. To do so would place petitioner wife in a position of either unintentionally or unwittingly filing a return. Our holding seems especially appropriate here, where copies of the returns had been requested by respondent's agents who caused them to be filed without asking petitioner wife's consent or without her knowledge. Accordingly, we hold that no returns were filed for the 1979, 1980, 1981 or 1982 taxable years. Respondent also argues that petitioner wife is equitably estopped from arguing that she did not sign or intend to file a joint return, citing United States v. Wynshaw, 697 F.2d 85, 87 (2d Cir. 1983). Respondent's reliance on that case is inapposite because that case is distinguishable from the one before us. The principle involved in the Wynshaw case concerns a situation where a joint return is actually filed by one spouse and the other spouse is estopped from denying his or her consent to the filing of a joint return. Here no return was filed by either spouse. Accordingly, even though petitioner wife may have signed and consented to a joint return, that consent does not extend to the filing *335 of the copies by respondent's agent without the consent of petitioner wife. Is the Ponzi Scheme Income Community Property?
Petitioner wife, with respect to the Ponzi scheme income, does not dispute the amount or calculation of that item in the notices. Instead, she argues that the Ponzi scheme income belonged to her husband. She argues that the income was generated by petitioner husband's illegal enterprise and that it does not constitute community income under California law. More specifically, petitioner wife's position is that petitioner husband did not acquire the misappropriated property within the meaning of the California statutes because he did not have title to the property. The lack of title causes the property to remain the separate property of the spouse in possession of such property. Respondent contends that petitioner wife's argument is flawed in three respects. First it is argued that the prenuptial agreement displaces the acquired or title arguments. Second, respondent argues that irrespective of whether the Ponzi scheme income was the separate property of petitioner husband, it was commingled with commission and real estate income creating a presumption *336 that all of it is community property. Finally, respondent argues that irrespective of whether the Ponzi scheme income was separate property of petitioner husband, petitioner wife obtained possession and enjoyment of the misappropriated funds as her separate property. [10]
We now consider whether the prenuptial agreement has any effect upon petitioners' community property rights. Separate property may be converted into community property or vice versa at any time by agreement between the spouses. Beam v. Bank of America, 490 P.2d 257 (Cal. 1971); *337 Woods v. Security First National Bank, 299 P.2d 657, 659 (Cal. 1956). If recognized under State law, the transmutation will be effective for Federal tax purposes. Helvering v. Hickman, 70 F.2d 985 (9th Cir. 1934); Estate of Vogel v. Commissioner, 30 T.C. 125, 131-132 (1958), affd. 278 F.2d 548 (9th Cir. 1960). Respondent argues that the prenuptial agreement converts the Ponzi scheme funds into community property even if petitioner husband did not have title to the funds. Respondent directs our attention to the following language in the prenuptial agreement: "All income from labor and/or salary by the [petitioner] husband shall be the community property of the husband and wife." Respondent's point here is that petitioners, by their prenuptial agreement, have obviated the effect of the word "acquired" which appears in the California community property statute. This is in response to petitioner wife's argument that the term "acquired" connotes that there must be title to the property, rather than mere possession for the property to be treated as community property. Petitioner wife argues that respondent's *338 basic premise that the language of the prenuptial agreement was intended to displace the effect of California community property law is unsound. We agree with petitioner wife. The term "All income from labor" does not necessarily imply or connote a different standard from the concept intended by use of the term "acquired". The language "from labor and/or salary", however, would distinguish earnings from receipts by gift or inheritance. We cannot agree with respondent's interpretation of the prenuptial language as contemplating and or affecting the controversy under consideration. Finally, respondent argues that the Ponzi scheme income was commingled with gains from the sale of realty and commissions which may have been earned in connection with the Ponzi scheme. This commingling, according to respondent, results in community property, irrespective of whether the property is separate property at the time of the commingling. Petitioner wife does not disagree that commingled property becomes community property. Instead, she argues that factually there was no commingling. We have found that petitioners kept their finances separate. Petitioner wife maintained her own separate *339 bank accounts and was substantially unaware of petitioner husband's business activity or finances. As a factual matter, we are constrained to find that the parties funds were commingled. In this regard petitioner husband provided some gifts to petitioner wife and also made periodic payments toward household expenses. Otherwise there was no commingling or information in this record enabling us to decide whether the amounts paid over to or on behalf of petitioner wife were from the Ponzi scheme or some other source of petitioner husband's income. Respondent also makes a distinction between the commissions that petitioner husband purported to charge investors and the investors' funds retained by petitioner husband. Respondent, however, did not segregate commissions from retained funds for purposes of her determination. Respondent's deficiency determination was based upon a reconstruction of petitioner husband's income arrived at by reducing all receipts by all payments during each annual period. With respect to the real estate transactions, these amounts were invested during the 1979, 1980, 1981, and 1982 taxable years and may have been purchased with misappropriated funds. It *340 is unlikely that the real estate was commingled with the investors' funds for purposes of the deficiency determination, because petitioner husband is being charged by respondent with real estate gains separate and apart from the reconstructed Ponzi scheme income. However, the real estate was foreclosed upon or released to co-owners during 1983 after petitioner husband's Ponzi scheme collapsed. Having rejected respondent's three theories, we must decide whether the Ponzi scheme funds did become community property. Under California law, community property is defined as property acquired by husband and wife, or either, during marriage, when not acquired as the separate property of either. Cal. Civ. Code sec. 687 (West 1982); see also Cal. Civ. Code sec. 5110 (West 1983). The earnings of the husband (or either spouse) during marriage are the parties' community property. People v. Rainville, 114 Cal. Rptr. 902, 905 (Ct. App. 1974); People v. Lockett, 102 Cal. Rptr. 41 (Ct. App. 1972). In the instant situation, we are dealing with illegal income obtained through theft or embezzlement. On this point petitioner wife relies on Karageris v. Karageris, 302 P.2d 850 (Cal. Ct. App. 1956), *341 Johnson v. Commissioner, 72 T.C. 340, 343-346 (1979), and Hilton v. Commissioner, T.C. Memo. 1990-379. Johnson and Hilton are cases of this Court involving consideration of Texas and Louisiana community property law. Each case contains the rationale that in the respective jurisdictions, one spouse must have title to property before it can become community property. Stated another way, property acquired without title remains the separate property of the possessor. The Karageris case is a California case which holds that title to property entrusted from one brother to another brother did not pass, and accordingly the wife of the entrusted possessor of the property was not entitled to a one-half share under community property concepts. That case would place California in line with Texas and Louisiana concerning the effect of the lack of title upon community property. Accordingly, we must determine whether title to the Ponzi scheme funds passed from the investors to petitioner husband under California law. Petitioner husband pled guilty to three counts of grand theft, a felony offense under section 487(1) of the California Penal *342 Code. In the amended felony complaint filed against petitioner husband, it was alleged that the investors did not intend to pass title to their funds to Mr. Berenbeim. It was also alleged that the funds were given over for investment purposes to receive income for a period of time and then the principal was to be returned to the investors. The civil complaints filed against petitioner husband contained allegations that the plaintiff-investors did not intend to pass title and that the funds were given over for investment purposes. Further, it was alleged that the funds could be withdrawn at any time on 24 hours' notice. Under California law grand theft includes the crimes of larceny by trick or device and obtaining money by false pretenses. People v. Schwenker, 12 Cal. Rptr. 408 (Ct. App. 1961). The essence of grand theft is the felonious taking of personal property of another. People v. Phelps, 13 Cal. Rptr. 383 (Ct. App. 1961). Grand theft by means of false pretenses requires a showing that (1) the defendant used false pretenses or made false representations, (2) the representations were made with intent to defraud the property owner, *343 and (3) the owner was in fact defrauded by parting with property in reliance upon the representations. People v. Britz, 95 Cal. Rptr. 303 (Ct. App. 1971). The grand theft crime of larceny by trick or device consists of appropriation of money or property, possession of which was fraudulently acquired, and usually results when the victim intends it shall be applied to a special purpose, as a loan, to enable defendant to carry out some special plan, as an investment, or for purchase of property, which money defendant intends to appropriate to his own use. In these instances, title does not pass to defendant upon delivery of possession of property or money. Cal. Pen. Code sec. 484 (West 1988); People v. Krupnick, 332 P.2d 720 (Cal. Ct. App. 1958). Under California law there are two significant distinctions between theft by trick or device and theft by false pretenses. In the former, the owner intends to part with possession of property but not with title thereto, while in the later the owner intends to transfer title as well as possession. Additionally, corroboration is required to prove theft by false pretenses but not to prove theft by *344 trick or device. People v. Riley, 31 Cal. Reptr. 404 (Ct. App. 1963). Theft by false pretenses, as distinguished from theft by trick or device, requires a transfer of title. People v. Aiken, 34 Cal. Rptr. 828 (Ct. App. 1963). The facts here reveal that the investors did not intend to part with title to their funds. The testimony of investors, pleadings of civil and criminal matters connected with the Ponzi scheme, and the various exhibits evidencing the transactions here reflect that it was not intended that title to the funds pass to Mr. Berenbeim. This is also true as a matter of law. Therefore Mr. Berenbeim was without title and the Ponzi scheme income was not community property under California law. Community Property -- Is There Income of Petitioner Husband Attributable to Petitioner Wife on Items Other Than the Ponzi Scheme?
Even if the Ponzi scheme portion of petitioner husband's income is not taxable to petitioner wife, respondent argues that petitioner wife had community property income from commissions and gains on real estate. With respect to the argument regarding the commissions, we disagree with respondent's position. *345 Although respondent argued that the commissions are a separate and authorized portion of the transactions with petitioner husband's investors, respondent did not separately determine such portions. Respondent reconstructed petitioner husband's income from the Ponzi scheme transactions by reducing the total amount received by the total amount repaid to investors each year. Respondent's theory of reconstruction, which we have approved, assumes that petitioner husband intended to retain possession of part or all of the investors' funds. Inherent in this theory is the premise that petitioner husband did not intend a normal investment transaction where he would be compensated by means of a commission. The essence of the actual transaction was misappropriation and fraud. Accordingly, respondent would have us treat the transaction one way for purposes of determining the amount of income involved and another for purposes of community property sourced income. This we will not do. Finally, respondent argues that the gains from the real estate transactions for 1982 are community property, part of which is attributable to petitioner wife. We agree, and according we must decide whether *346 petitioner wife is an innocent spouse with respect to the capital gain income for the 1982 taxable year. Innocent Spouse -- Section 66(c)
Having decided that no returns were filed for any of the 4 taxable years under consideration, including 1982, we look to section 66(c) to gauge whether petitioner wife has proven that she meets the requirements for innocent spouse treatment. Petitioner wife asserts that petitioner husband's income is not taxable to her pursuant to the relief provisions of section 66(c). Under this section, items of community income are not included in a spouse's gross income where all of the following four requirements are met: (1) The spouse seeking relief did not file a joint return for any taxable year; (2) the income item omitted from the gross income of the spouse seeking relief would be treated as the income of the other spouse under section 879(a); (3) the spouse seeking relief establishes that she did not know of and had no reason to know of such item of community income; and (4) under the facts and circumstances, it is inequitable to include such item of community income in the income of the spouse seeking relief. All four requirements must be *347 met before relief can be granted. Roberts v. Commissioner, 860 F.2d 1235, 1238 (5th Cir. 1988), affg. T.C. Memo. 1987-391. The parties here do not concern themselves with the first two elements. Their focus is upon the third and fourth elements. The third requirement of section 66(c) concerns whether petitioner wife "did not know of, and had no reason to know" of such "item of community income". We have looked to case law under section 6013(e) because of the similarity of the congressional intent underlying sections 66 and 6013(e) and because the same operative language is used in both sections to define the generalized objective and subjective tests. See Costa v. Commissioner, T.C. Memo. 1990-572. Under section 6013(e)(1)(C) it is not enough to merely show a lack of actual knowledge. A taxpayer must also show that he or she had no reason to know of the understatement. Adams v. Commissioner, 60 T.C. 300 (1973); Sonnenborn v. Commissioner, 57 T.C. 373 (1971). In order to prove that one had no reason to know, one must convince the trier of fact that a reasonably prudent person with *348 an equal level of knowledge of the surrounding circumstances would not and should not have known of the omissions (income), keeping in mind his or her level of intelligence, education, and experience. Sanders v. United States, 509 F.2d 162, 166-167 (5th Cir. 1975). In Terzian v. Commissioner, 72 T.C. 1164, 1170 (1979), we stated that "the standard to be applied is whether a reasonable person under the circumstances of the taxpayer at the time of signing the return could be expected to know" of the understatement. In this case, the nature of petitioners' relationship as to business and financial matters does not compel us to attribute knowledge of petitioner husband's activities to petitioner wife. Petitioners kept their funds and business activities separate and had entered into a prenuptial agreement. Petitioner wife believed that her husband was in the investment consulting business, but she was also aware of his relatively extensive real estate activity, especially during the later years in issue. Her knowledge of the real estate activity came from the fact that she was a nominee on petitioner husband's behalf in various real estate *349 transactions. In those instances, she was required to attend real estate closings and to sign various documents. Although we believe her testimony that she did not understand the documents or their import, she was aware of petitioner husband's real estate activity. As a general matter we also believe petitioner wife's testimony that she did not understand or have knowledge of his business activity. Her actual knowledge and involvement in the real estate activity along with her educational background are sufficient to hold that she did know of and had reason to know of the real estate items of community income. She knew that petitioner husband assisted in monthly household expenses by periodic payment of about $ 1,000 or more. She should have been aware of the improvement of their living conditions during the years under consideration, evidenced by the fact that petitioners progressed from a more moderate residence (apartment) to a home with a purchase price exceeding $ 300,000. In reaching our conclusion, we also considered petitioner wife's separate salary and use of her inheritance for certain purposes. Applying the section 66(c) criteria and with the assistance of section *350 6013(e)(1)(C) case law, we find that for the 1982 taxable year, petitioner wife did have reason to know of the items of community income with respect to gains from real estate. As to the fourth requirement of section 66(c), we find that under the facts of this case it would not be inequitable to hold petitioner wife liable for tax on her spouse's 1982 income from real estate. Additions to Tax
1. Failure To File
Respondent determined additions to tax with respect to petitioner wife under sections 6651(a)(1), 6653(a), 6653(a)(1) and (2), 6654, and 6661. Petitioner bears the burden of proof with respect to such determinations. Rule 142(a); Clayden v. Commissioner, 90 T.C. 656, 677 (1988); Abramo v. Commissioner, 78 T.C. 154, 162-164 (1982). We first discuss the failure to file, sec. 6651(a)(1), addition to tax, because respondent relies on that aspect, in part, to support her argument that petitioner wife is liable for the negligence addition under section 6653(a). The section 6651(a)(1) addition to tax is applicable unless it can be shown that the failure to file a tax return was not due to willful neglect and was due to reasonable *351 cause. These two standards have been discussed in case law over a 70-year period and were defined by the Supreme Court as follows: As used here, the term "willful neglect" may be read as meaning a conscious, intentional failure or reckless indifference. See Orient Investment & Finance Co. v. Commissioner, 83 U.S. App. D. C. 74, 75, 166 F.2d 601, 602 (1948); Hatfried, Inc. v. Commissioner, 162 F.2d 628, 634 (CA3 1947); Janice Leather Imports Ltd. v. United States, 391 F. Supp. 1235, 1237 (SDNY 1974); Gemological Institute of America, Inc. v. Riddell, 149 F. Supp. 128, 131-132 (SD Cal. 1957). Like "willful neglect," the term "reasonable cause" is not defined in the Code, but the relevant Treasury Regulation calls on the taxpayer to demonstrate that he exercised "ordinary business care and prudence" but nevertheless was "unable to file the return within the prescribed time." 26 CFR § 301.6651(c)(1) (1984); accord, e.g. Fleming v. United States, 648 F.2d 1122, 1124 (CA7 1981); Ferrando v. United States, 245 F.2d 582, 587 (CA9 1957); Haywood Lumber & Mining Co. v. Commissioner, 178 F.2d 769, 770 (CA2 1950); *352 Southeastern Finance Co. v. Commissioner, 153 F.2d 205 (CA5 1946); Girard Investment Co. v. Commissioner, 122 F.2d 843, 848 (CA3 1941) * * *. [United States v. Boyle, 469 U.S. 241, 245-246 (1985); fn. ref. omitted.[11]] Petitioner wife "bears the heavy burden of proving both (1) that the failure did not result from 'willful neglect,' and (2) that the failure was 'due to reasonable cause.'" Sec. 6651(a)(1); United States v. Boyle, supra at 245. In that case, the Supreme Court established a bright-line rule with respect to a taxpayer's filing obligation. Under the rule it is not reasonable, within the meaning of section 6651(a)(1), to rely on an agent or employee to meet the filing obligation. It may, however, *353 be reasonable to have untimely filed if a taxpayer relies upon an adviser (attorney or accountant) with respect to a matter of law which may have some effect on the timeliness of the return. United States v. Boyle, supra at 251. Boyle, its predecessors, and progeny, however, concern situations where no return was filed because of the advice or failure to act on the part of an adviser or agent. Here we deal with a taxpayer who attempted to timely meet her filing obligation. This case is more closely related to the line of cases where returns had been prepared and signed or where a taxpayer did everything reasonably possible to insure the filing of a return. [12] In a series of cases involving spouses residing in community property States where the spouse either attempted to file or was unable to file due to the unavailability of the tax information of the other spouse, we have held that the late filing addition was not applicable. See Fleming v. Commissioner, T.C. Memo. 1984-130; Connor v. Commissioner, T.C. Memo. 1982-302; Barker v. Commissioner, T.C. Memo. 1963-130; see also discussion in *354 Belk v. Commissioner, 93 T.C. 434, 446-448 (1989). Those cases analyze whether the tax information was available to the spouse and whether the spouse made a reasonable effort to meet the filing obligation. For example, the late filing addition was found applicable where the wife had not taken any steps to assure that her husband had performed his duty to file their joint return. Kern v. Commissioner, T.C. Memo. 1985-400. In another case, where the wife had separate income, she had not taken any steps to report her income and the addition to tax was sustained. James v. Commissioner, T.C. Memo. 1980-99. *355 Petitioner wife argues that she should not be held liable because "she believed in good faith that * * * [petitioner husband] had filed the joint returns"; because the tax withheld from her teaching salary was sufficient to pay the tax thereon; and because petitioner husband was a tax return preparer and that, in any event, petitioner wife should be able to rely upon her husband's assurance that taxes were reported and/or paid. Respondent argues that petitioner wife did not file after she knew or was suspicious about the possible failure to file returns and that she should not be allowed to simply rely upon her husband, citing Kern v. Commissioner, supra.
In the setting of this case, petitioner wife was timely asked for tax information each year. She would provide petitioner husband, who was a tax preparer, with her tax information. Petitioner husband would then complete a joint income tax return, containing the tax information of both petitioners, and submit it to petitioner wife for her signature. Petitioner wife would occasionally review the document and on each occasion she signed it and returned it to petitioner husband for filing. There was no *356 communication from respondent regarding failure to file or other indication that would have aroused petitioner wife's suspicions regarding the proper filing of a Federal return, until after the years under consideration. The first such contact by respondent's agent was with respect to petitioner wife's failure to file. Petitioner wife thought that this was a misunderstanding caused by her change of name when she married Mr. Berenbeim. Petitioner wife requested copies of the returns she thought were filed from petitioner husband. Petitioner husband provided what appeared to be retained copies of such returns, which bore the photocopied signatures of both petitioners. These copies were provided to respondent's revenue officer who was satisfied and closed his inquiry into the matter. It was not until after petitioner husband's Ponzi scheme had collapsed and respondent's agents confronted petitioners some 2 years after the first inquiry that petitioner wife could have had any idea that no returns had been filed for the years under consideration. We are also cognizant that petitioner wife was naive and not conversant in her husband's business matters, and that petitioner husband *357 was attempting to deceive petitioner wife. We find certain weaknesses in respondent's argument that petitioner wife should have filed returns after having been made aware of the possibility that no joint returns had been filed for 1979 through 1982. Petitioner wife's failure to act after discovery of the failure to file is much less relevant than her actions at the time the return was due to be filed. We do not give much probative weight to petitioner wife's failure to file after she became aware that no returns were filed. At the time that the special agent was investigating petitioners, petitioner husband continued to contend that returns had been filed. Moreover, with respect to 1980, 1981, and 1982 respondent's agents instructed the service center employees to file the copies of returns provided by petitioner wife (without her knowledge or consent). Additionally, petitioner wife was being charged with the income of petitioner husband and did not agree with such assertions and, because of potential conflicts of interest between petitioners, was separately represented before respondent and in this litigation. Prior to the 1986 inquiry by respondent's agents, it would not have *358 been reasonable, in the setting of this case, for petitioner wife to verify the actions of her spouse where there was no reason to prompt such inquiry. [13]
Under these unique circumstances, we hold that petitioner wife made a reasonable effort to meet the filing obligation and that she has met her burden of showing the lack of willful neglect and that there was reasonable cause for her failure to file. Accordingly, the addition to tax under section 6651(a)(1) is not applicable to petitioner wife for the years in issue. 2. Negligence
Section 6653(a) provides that if any part of any underpayment of tax is due to negligence or the intentional disregard of the rules and regulations, *359 there shall be added to the tax an amount equal to 5 percent of the entire underpayment plus, for the taxable years 1981 and 1982, 50 percent of the interest payable with respect to the portion of the underpayment attributable to the taxpayer's negligence or his intentional disregard of the rules and regulations. Negligence, within the meaning of sec. 6653(a), has been defined as the failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Taxpayers have a statutory duty to timely file their income tax returns, sec. 6072(a), and the breach of this duty may be sufficient evidence of negligence. See Emmons v. Commissioner, 92 T.C. 342 (1989), affd. 898 F.2d 50 (5th Cir. 1990). Ordinarily, a reasonable and prudent person would comply with a statutorily prescribed deadline applicable to him or her. Here again respondent argues that petitioner wife did not file after she knew or was suspicious about the possible failure to file returns. Respondent also argues that failure to report large amounts of income is evidence of negligence. In this *360 regard, respondent relies upon her arguments with respect to the community property and innocent spouse issues that petitioner wife knew or should have known of petitioner husband's omitted income. Respondent's reliance upon the failure to file is not persuasive in light of our finding that said failure was due to reasonable cause. Additionally, our finding that the Ponzi scheme income was not community property causes respondent's argument that petitioner wife failed to report large amounts of petitioner husband's community property income to fail. Although we have found that the real estate gains were community property, that pertains only to the year 1982. Here petitioner wife, due to income tax withholding from her wages, would have had relatively little, if any, tax due for the 1979, 1980, and 1981 years. Also, as a practical matter, petitioner husband's records of his business activities were not available to petitioner wife. With respect to the 1982 taxable year, petitioner wife would have had to report one-half of her salary, her interest income, and one-half of the real estate gains of petitioner husband. It does not appear that an individual return for petitioner *361 wife's 1982 taxable year would have produced any appreciable amount of tax. Under the circumstances of this case petitioner wife acted reasonably, in good faith reliance on what she believed was competent advice and ostensibly appropriate actions on the part of her husband. Nelson v. Commissioner, 19 T.C. 575 (1952). We believe petitioner wife's testimony and find that it was reasonable for her to rely upon her husband in this case. Here petitioner wife relied upon her husband and until the time respondent's special agent began investigating, she had reason to believe that her income had been properly reported to respondent. We therefore hold that petitioner wife is not liable for additions to tax under sections 6653(a) and 6653(a)(1) and (2). 3. Substantial Understatement
Respondent also determined an addition to tax for substantial understatement of tax under section 6661 for the 1982 taxable year. Section 6661 provides a 25-percent addition to tax if there is a substantial understatement of income tax. An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown for the taxable year or $ 5,000. An understatement *362 does not include an amount attributable to "the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment". Sec. 6661(b)(2)(B)(i). Additionally, an understatement does not include any item for which there was adequate disclosure. Sec. 6661(b)(2)(B)(ii). Petitioners do not argue that there was adequate disclosure in this case. Petitioner wife only argues that there can be no substantial understatement where no returns are filed. Respondent, on brief, conceded that if the Court decided that no return was filed for 1982, that the section 6661 issue is abandoned. Wherefore, we hold that petitioner wife is not liable for an addition to tax under section 6661 for 1982. 4. Estimated Tax
Finally, respondent determined an addition under section 6654 for failure to pay estimated tax. Petitioner wife has argued that the withholding from her teaching salary would be sufficient to fully *363 or substantially pay the tax due. That argument does not consider inclusion of one-half of the gains from real estate during 1982. In view of our holdings above, we hold that section 6654 is applicable for the 1982 taxable year only to the extent that there is an underpayment of tax for 1982. To reflect the foregoing, Decisions will be entered under Rule 155.
Footnotes
1. Petitioners have been married during all pertinent periods in question. Respondent determined that neither petitioner filed a return for 1979 but that returns were filed for 1980, 1981, and 1982. The parties disagree concerning whether returns were filed for the later 3 years. Accordingly, respondent sent each petitioner a separate notice for 1979, splitting their income under community property principles, and a joint notice was sent to petitioners for 1980, 1981, and 1982. From these notices, petitioners, who are not jointly represented in this proceeding, filed separate petitions and these cases have been consolidated for purposes of trial, briefing, and opinion. ↩
2. Petitioner Jerome P. Berenbeim may also be referred to as petitioner husband or Mr. Berenbeim. Petitioner Phyllis M. Curtis Berenbeim may also be referred to as petitioner wife or Mrs. Berenbeim.↩
1. Plus 50 percent of the interest due on any income tax deficiency.↩
3. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
4. Respondent has conceded that petitioner Phyllis M. Curtis Berenbeim is not liable for additions to tax under sec. 6653(b) for 1979, 1980, and 1981, and that she is not liable for additions to tax under sec. 6653(b)(1) and (2) for 1982. In lieu thereof, respondent had determined in the alternative that Phyllis M. Curtis Berenbeim is liable for additions to tax under sec. 6653(a) for 1979 and 1980; sec. 6653(a)(1) and (2) for 1981 and 1982; sec. 6651(a)(1) for 1979; and sec. 6651(a)(1) for 1980, 1981, and 1982, if we should determine that she did not file returns for those years. All other additions to tax are as shown in the schedule in which this footnote is referenced. Even if we decide that petitioner wife is an innocent spouse for all taxable years, we must consider the additions to tax for all years because she has conceded that she had salary from teaching and that the period for assessment had not expired.↩
5. A typical "Ponzi" scheme is a pyramiding technique by which the earlier investors receive their returns from the principal of their own funds and from the principal of later investors. Typically, the Ponzi scheme operator diverts, for his personal benefit, some portion of the money received, causing a need to expand the number of investors in order to cover repayments of principal and promised returns on principal to the existing investors. These schemes generally fail when no new investors can be found or where too large a percentage of existing investors wish to be repaid their principal thereby collapsing the pyramid. See, e.g., Murphy v. Commissioner, 661 F.2d 299, 300 (4th Cir. 1981), affg. per curiam T.C. Memo. 1980-218↩.
6. We do not make specific findings concerning the commissions because we find that the transactions result in income to petitioner husband for the investors' funds retained by petitioner husband.↩
7. Petitioner wife was separately represented and petitioner husband was pro se. The conflict between petitioners concerns their approaches to the innocent spouse issue. Seriatim briefs were ordered. Each party with a burden of proof was required to submit an opening brief and the other two parties were then free to reply, as appropriate. Respondent has the burden of proof with respect to fraud and showing some fraudulent understatement. Petitioner husband has the burden of proof with respect to the amount of the income tax deficiency and whether returns were filed. Petitioner wife has the burden of proof with respect to various additions to tax, including negligence and delinquency additions, whether returns were filed for 1980, 1981, 1982, and whether she qualifies as an innocent spouse. We also note that petitioner husband had asked for several extensions for filing his brief and replies, but he failed to submit any brief or reply to the various briefs of respondent and petitioner wife.↩
8. See also Dixon v. Commissioner, 28 T.C. 338, 346-348 (1957); Smart v. Commissioner, T.C. Memo. 1987-279; Hammann v. Commissioner, T.C. Memo. 1987-260↩.
9. Respondent, on brief, presented a detailed analysis of sec. 6091 and the proper place for petitioners herein to file.↩
10. Respondent's last argument is not supported by any authority and does not relate to the question of income or community property. The use or enjoyment of the property (misappropriated funds) by one other than the person who misappropriated the funds would not, ipso facto, result in income. Also, respondent has not connected the concept of enjoyment or possession with the principles of community property in California. Accordingly, we do not address respondent's last argument.↩
11. We note that neither party cited or relied upon United States v. Boyle, 469 U.S. 241↩ (1985). We are accordingly unaware whether the failure to reference that case was inadvertent or a considered decision.
12. See also cases where the return had been prepared and then misplaced. United Aniline Co. v. Commissioner, T.C. Memo. 1962-60, affd. without discussion of this point 316 F.2d 701 (1st Cir. 1963); Hammonton Investment & Mortgage Co. v. Commissioner, T.C. Memo. 1959-212, affd. without discussion of this point 284 F.2d 950 (3d Cir. 1960); Levine v. Commissioner, T.C. Memo. 1963-230↩.
13. We are cognizant of the marital relationship here and considered whether it would have been reasonable for petitioner wife to check with respondent as to whether petitioner husband had in fact filed. Marital relationships are usually based upon mutual trust and such unprecipitated inquiries would not foster a trusting relationship.↩